IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| FIRST DATA MERCHANT SERVICES CORPORATION, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-12-2568 |
| SECURITYMETRICS, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This origins of this contentious case lie in a soured business relationship and the settlement of earlier litigation in the United States District Court for the District of Utah.  In this action, Plaintiffs First Data Merchant Services Corporation ("FDMS") and First Data Corporation ("FDC") (collectively "First Data") assert claims against Defendant SecurityMetrics, Inc. ("SecurityMetrics") relating to SecurityMetrics' alleged post-settlement misconduct. [1]  SecurityMetrics subsequently asserted fifteen counterclaims sounding in various doctrines of contract, trademark, and antitrust law.  Currently pending before this

---

[1] Specifically, FDMS's original Complaint alleged tortious interference with existing and prospective contractual and business relationships (Count I), false endorsement/association in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count II), trademark, service mark and trademark infringement in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A) (Count III), false advertising in violation of the Lanham Act 15 U.S.C. § 1125 (a)(1)(b) (Count IV) and common law unfair competition (Count V). Following a stay of this action pending final disposition of the earlier case filed in the District of Utah and the subsequent denial of FDMS's Preliminary Injunction Motion filed in this Court, FDMS was permitted to amend its Complaint (ECF No. 91).

The Amended Complaint (ECF No. 92) filed by both First Data Plaintiffs seeks declaratory relief (Counts I & IX) and alleges breach of contract (Count II), common law unfair competition (Count III), tortious interference with existing and prospective contractual and business relationships (Count IV), injurious falsehood (Count V), as well as violations of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A) (Counts VI, VII & VIII).

Court are six motions *in limine* filed by Plaintiff and Counterdefendant First Data.[2]  The first

five motions address SecurityMetrics' expert witnesses and seek to exclude their reports,

opinions, and testimony in their entirety.  The first Motion[3] (ECF No. 253) pertains to Dr.

Michael Belch, a marketing professor who conducted a market survey of consumer

perceptions of the term "PCI Rapid Comply."  The second Motion[4] (ECF No. 254) targets

the opinions and testimony of Robert Philbin, a former high-level employee of both First

Data and a competitor and a consultant in the payment card industry. The third Motion[5]

(ECF No. 256) addresses Dr. Christopher Pleatsikas, an economist who assessed the effects

of First Data's alleged conduct.  The fourth Motion[6] (ECF No. 259) pertains to Adam Atlas,

an attorney who represents various independent sales organizations ("ISOs") who operate

---

[2] The following substantive motions also remain pending: (1) First Data's Motion for Summary Judgment as to Certain of SecurityMetrics' Counterclaims (ECF No. 272); (2) SecurityMetrics' Motion for Partial Summary Judgment on Contract Claims and Counterclaims (ECF No. 275); (3) SecurityMetrics' Motion for Partial Summary Judgment on Common Law Tort and Lanham Act Claims (Counts III-VIII) (ECF No. 277); (4) First Data's Cross-Motion for Summary Judgment as to SecurityMetrics' First Counterclaim (ECF No. 294); (5) SecurityMetrics' Motion *in Limine* to Exclude Portions of Expert Report and Testimony of J. Gregory Sidak (ECF No. 296); (6) SecurityMetrics' Motion *in Limine* to Exclude Portions of Dr. Richard Gering's Report, Testimony, and Demonstrative Exhibits at Trial (ECF No. 300); and (7) First Data's Motion to Strike the November 12, 2014 "Pinch-Hitting" Declaration of Expert Robert Philbin (ECF No. 310).  There is a hearing on these other open motions scheduled for Friday, December 12, 2014.  The trial in this case remains scheduled for January 12, 2015.

[3] The full title of First Data's first motion is "First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Michael Belch, Ph.D."  This motion will be cited as "MIL #1."

[4] The full title of First Data's second motion is "First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Robert J. Philbin."  This motion will be cited as "MIL #2."

[5] The full title of First Data's third motion is "First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Christopher Pleatsikas, Ph.D."  This motion will be cited as "MIL #3."

[6] The full title of First Data's fourth motion is "First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Adam N. Atlas, Esq."  This motion will be cited as "MIL #4."

within the payment card industry.  The fifth Motion[7] (ECF No. 260) relates to Clarke Nelson, an accountant who compiled an assessment of First Data's PCI compliance-related revenue and SecurityMetrics' lost profits.  The sixth and final Motion[8] (ECF No. 262) relates to various attachments to Nelson's report, including a declaration by SecurityMetrics' in-house counsel Brandon Bastian, a chart listing recorded telephone calls between SecurityMetrics and various merchants and ISOs, and "Schedule 16," a table similar to the chart that contained some additional information about the callers.  All six of the Motions are fully briefed, and this Court has reviewed the parties' submissions.  Additionally, this Court held a hearing on the Motions on November 6, 2014.  For the reasons that follow, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Michael Belch, Ph.D. (ECF No. 253), Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Adam N. Atlas, Esq. (ECF No. 259), and First Data's Motion *in Limine* to Exclude the Declaration and Testimony of Attorney Brandon L. Bastian and Certain Other Related Documents (ECF No. 262) are GRANTED.  Additionally, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Robert J. Philbin (ECF No. 254) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted with respect to his third opinion that "the objectives of the PCI Data Security Standard" are disserved when a processor provides both transaction processing and PCI compliance services and the motion is denied with respect to Philbin's opinions about

---

[7] The full title of First Data's first motion is "First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Clarke B. Nelson."  This motion will be cited as "MIL #5."

[8] The full title of First Data's sixth and final motion is "First Data's Motion *in Limine* to Exclude the Declaration and Testimony of Attorney Brandon L. Bastian and Certain Other Related Documents."  This motion will be cited as "MIL #6."

market concentration, barriers to entry, and frequency of movement between processors. Finally, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Christopher Pleatsikas, Ph.D. (ECF No. 256) and Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Clarke B. Nelson (ECF No. 260) are DENIED.

BACKGROUND

As this Court has already issued a number of written opinions and letter orders in this case, and because the pending motions relate to evidence supporting SecurityMetrics' counterclaims, the Court includes only a short summary of the relevant allegations here.

### A. The Payment Card Industry

The term "PCI" is as an acronym for "Payment Card Industry."  The PCI Security Standards Council ("PCI Council") was formed in 2006 by the major credit card brands. The PCI Council developed the PCI Data Security Standard ("PCI Standard" or "PCI DSS"), which has been adopted by the major credit card brands as their data security compliance requirement for all merchants.  Thus, the card brands enforce compliance with the PCI Standard and determine the penalties for non-compliance.  While the PCI Standard's requirements vary based upon the size of a merchant, the category of merchants at issue in this case are "Level 4 merchants"[9]—those merchants with the lowest transaction

---

[9] Specifically, SecurityMetrics alleges:

> For PCI Standard compliance validation purposes, Visa, MasterCard, and Discover each divide merchants into four levels; American Express divides them into three; and JCB divides them into two. Following the classifications used by Visa and MasterCard, the lowest-volume merchants are commonly referred to as "Level 4 merchants."

Def.'s Countercl. ¶ 30.  The Court adopts this terminology herein.

volume. Level 4 merchants are more numerous than higher-volume merchants and, as such, have the highest number of transactions collectively.

Within the payment card industry, there are a number of different types of certified PCI standard compliance service vendors.[10] The Card Brands recognize each of those certifications. SecurityMetrics has a number of these PCI Council certifications while First Data allegedly does not.

## B. The Relationship of the Parties

First Data is a global payment processor engaged in the business of processing credit and debit card transactions for merchants and independent sales organizations ("ISOs") who use First Data's card processing services. SecurityMetrics provided PCI compliance services to some merchants for whom First Data provides processing services.

For several years, the parties worked together pursuant to a series of contracts. The agreement was last renewed on January 3, 2012. SecurityMetrics alleges, however, that First Data materially breached the agreement in April 2012 and then unilaterally and prematurely terminated it in May 2012.

Additionally, SecurityMetrics alleges that in June 2012 First Data began offering a service called "PCI Rapid Comply," which competes with the services offered by SecurityMetrics. SecurityMetrics alleges that, when calculating its billing minimums for ISOs, First Data counts fees for PCI Rapid Comply towards the required minimums, but refuses to count costs or fees paid to vendors of other PCI compliance services. In addition,

---

[10] These PCI compliance service vendors include Approved Scanning Vendors ("ASVs"), Qualified Security Assessors ("QSAs"), Payment Application Qualified Security Assessors ("PA-QSAs"), PCI Forensic Investigators ("PFIs"), and Point-to-Point Encryption assessors ("P2PEs").

SecurityMetrics asserts that First Data told merchants that they would have to pay for PCI Rapid Comply even if they used a different security compliance vendor.

In May of 2012, FDMS filed suit in *First Data Merchant Services Corporation v. SecurityMetrics, Inc.*, Case No. 2:12-cv-495 ("Utah Action") in the United States District Court for the District of Utah ("Utah Court") and moved for a temporary restraining order and preliminary injunction.[11]  The Utah Court denied the motion, and the parties entered mediation, which resulted in the signing of Terms of Settlement ("Settlement Terms") by both parties on May 31, 2012.[12]

## C.  The Presently Pending Action

Nevertheless, less than three months after that settlement, First Data filed the presently pending action before this Court on August 27, 2012.  Following a stay of this

---

[11] Specifically, First Data sought to force SecurityMetrics to format its security compliance reports in the same manner that it had during the parties' contractual relationship.  SecurityMetrics ceased using that type of reporting after First Data terminated the contract.

[12] The Terms of Settlement is a one page document, reading in relevant part:

> First Data Merchant Services ("FD") and SecurityMetrics, Inc. ("SM") agree to the following essential terms of settlement:
> - The parties shall incorporate these terms of settlement in a final settlement agreement, in a form and with content mutually acceptable to both parties, [REDACTED].
> - [REDACTED]
> - The parties shall keep confidential the terms of this settlement and those facts and circumstances forming the basis of or that relate to allegations that were asserted by both parties in connection with this dispute, and shall include mutual confidentiality provisions in a final settlement agreement.
> - The parties shall agree to mutual non-disparagement provisions, consistent with the relationship of competitors in a free market place, in a final settlement agreement.
> - [REDACTED]
> - FD shall dismiss with prejudice the lawsuit it filed in Federal Court, and the parties hereby mutually release each other from any and all obligations and claims, known or unknown.

Def.'s Countcl. Ex. F, ECF No. 157-6.

action pending final disposition of the Utah Action and the subsequent denial of FDMS's

Preliminary Injunction Motion filed before this Court, FDMS was permitted to file an

Amended Complaint (ECF No. 92).  SecurityMetrics answered the Complaint and asserted

fifteen counterclaims of its own against First Data. *See* ECF No. 157.  SecurityMetrics'

Counterclaims include claims for Specific Performance of the First Settlement Term (Count

I), declaratory judgment with respect to third and fifth Settlement Terms (Counts II & III),

injurious falsehoods (Count IV), federal false advertising (Count V), federal false

endorsement (Count VI), cancellation of registration (Count VII), Utah Deceptive Trade

Practices violations (Count VIII), tortious interference (Count IX), restraint of trade under

federal and Maryland law (Counts X & XII), monopolization and attempted monopolization

under federal and Maryland law (Counts XI & XIII), Maryland predatory pricing (Count

XIV), and Maryland tying (Count XV).  First Data's currently pending Motions *in Limine*

target the evidence that SecurityMetrics seeks to proffer in support of these claims.

## STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence provides that an expert witness may testify

in the form of an opinion or otherwise if "(a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the

product of reliable principles and methods; and (d) the expert has reliably applied the

principles and methods to the facts of the case.  FED. R. EVID. 702.  A court's role in

applying Rule 702 is to act as a gatekeeper, excluding unreliable expert testimony.  *Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137

(1999) (holding that *Daubert*'s gatekeeping obligation, applies not only to scientific testimony but to all expert testimony).

In determining whether proffered expert testimony is reliable, the district court has broad discretion to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved, and no single factor is necessarily dispositive. *See Kumho Tire*, 526 U.S. at 152-53. "The court, however, should be conscious of two guiding, and sometimes competing, principles: (1) 'that Rule 702 was intended to liberalize the introduction of relevant expert evidence'; and (2) 'that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading.'" *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

The proponent of expert testimony bears the burden of production to come forward with evidence to support its contention that an expert's testimony would be both reliable and helpful. *See Bourjaily v. United States*, 483 U.S. 171 (1987). The Court in *Daubert* reminded district courts, however, that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Moreover, the U.S. Court of Appeals for the Fourth Circuit has held that "[a] court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261.

<u>ANALYSIS</u>

1. __First Data's Motion *in Limine* #1 – Expert Michael Belch__

First Data's first Motion *in Limine* pertains to the expert report, opinions, and testimony of Dr. Michael Belch ("Dr. Belch"), a marketing professor at San Diego State University. Dr. Belch performed a market survey relating to customers' perceptions of the name "PCI Rapid Comply." The specific scope and purpose of the survey is the subject of some dispute by the parties. Based on the survey, Dr. Belch opined that, "if PCI Rapid Comply is not approved or certified by the PCI Council, the consumer (merchant) is being deceived and harmed by the creation of a false sense of security, and the fact that they are paying for a service they are not receiving." Belch Report ¶ 23, MIL #1 Ex. A, ECF No. 253-2.

First Data specifically attacks the methodology used by Dr. Belch in his study. First Data points out that Dr. Belch's report states that he was engaged in order "to opine on whether [First Data's] . . . use of 'PCI'" in its 'PCI Rapid Comply' solution . . . has misled relevant consumers (Level 4 merchants) into believing that the company is affiliated with, connected to, sponsored by or approved by the . . . [PCI Council]." Belch Report ¶ 8; *see also* Reply Mot. in Limine #1 5, ECF No. 282. First Data asserts that, in light of this focus, Dr. Belch should have employed a control because his survey tested for causation—i.e., whether the name PCI Rapid Comply created confusion among merchants. *See* Mem. Supp. MIL #1, at 7. First Data suggests that the confusion could have been attributed to "demand effects, 'noise' or prior information known by consumers." Mem. Supp. MIL #1, at 10. SecurityMetrics, however, asserts that Dr. Belch's survey was "designed to gauge Level 4

Merchants' *perceptions* about the name 'PCI Rapid Comply.'"   Resp. MIL #1, at 6, ECF No. 269.

Despite SecurityMetrics' characterization of the purpose of Dr. Belch's survey, this Court is concerned by the survey's lack of control in this situation.   While Dr. Belch purports to test consumer perceptions, his report contains a clear conclusion that consumers are confused—and, in fact, deceived—and attributes that confusion to the use of the term "PCI" in the name "PCI Rapid Comply."   *See* Belch Report ¶ 16 ("Should this list [of approved PCI compliance companies and providers on the PCI Council's website] constitute the complete listing of approved companies, then it is my opinion that use of PCI Rapid Comply misleads merchants.   Further, users of PCI Rapid Comply are being misinformed by these false endorsements and believe they are using a product that is endorsed, approved or authorized by the PCI Council.").   SecurityMetrics has not adequately explained how Dr. Belch came to his conclusions on consumer confusion as is its burden on Rule 702.[13]   While Dr. Belch's results tend to show some confusion on the part of merchants, there is no basis for Dr. Belch's conclusions regarding the cause of that confusion.   Nor has SecurityMetrics identified any case where a comparable survey was admitted into evidence.[14]   Accordingly,

---

[13] Notably, First Data's expert Dr. Gary T. Ford, criticized the report for failure to use a control.   *See* Mem. Supp. MIL #1, at 8 (citing Rebuttal of "Expert Report of Michael Belch, Ph.D.," Mem. Supp. MIL #1 Ex. F). Moreover, Dr. Belch himself acknowledged that he was not "sure that [he] attempted to or even opined that it was the use of the word 'PCI' in 'PCI Rapid Comply' that led to my opinion" and he further suggested that if he "was trying to parcel out specifically the effects of PCI, then [he] would probably have done an experiment." Reply MIL #1 (citing Belch Depo., MIL #1 Ex E at 108:8-14).

[14] Instead, SecurityMetrics points to a 2005 survey conducted by First Data's survey expert performed on behalf of the ABA Section of Science & Technology Law.   That survey was designed to "ascertain corporate counsel's opinions about recent trends in data management, electronic discovery and the proposed changes in the Federal Rules."   Resp. MIL #1, at 7.   Of course, this survey was not designed to be evidence in a lawsuit. Moreover, the survey clearly intended to gather information—in other words, it sought to collect comments

this Court finds the lack of a control to be a significant flaw under the circumstances presented here.

Moreover, even if a control was not necessary, there are several other troubling aspects to Dr. Belch's survey.  For example, the survey tested consumer perceptions based upon the name of the product alone and divorced the name from any of the typical marketing materials that consumers would encounter.  Moreover, the original, online version of the survey was not preserved and was never turned over to First Data.  Additionally, the survey questions repeatedly mentioned the name "PCI Rapid Comply," creating bias concerns that have not been addressed due to the failure to include a control.  Thus, even if Dr. Belch's opinions are limited to consumers' "perceptions," this Court finds that those opinions could confuse a jury and lead jurors to conclude that the name "PCI Rapid Comply"—rather than any other factor—has caused consumer confusion.  Indeed, in light of numerous other problems with Dr. Belch's survey, such an inference is likely to be erroneous.  Accordingly, Dr. Belch's report, opinions, and testimony will be excluded.

## 2. First Data's Motion *in Limine* #2 – Expert Robert Philbin

First Data's second Motion *in Limine* addresses the opinions, testimony, and report of Robert J. Philbin.  Philbin worked for First Data for 16 years (until 1998) and for Total System Services, Inc. ("TSYS"), a competitor of First Data, for 6 years (until 2010). After he stopped working for TSYS in 2010, Philbin has worked as an advisor and consultant to venture capitalists.   Philbin is proffered as an experiential witness who will offer the following opinions: (1) "[t]he processing segment of the payment card industry is highly

and feedback.  Thus, the purpose of that survey is clearly distinguishable from the one before the Court, where SecurityMetrics seeks to test the effect that a certain term has in the eyes of merchants.

concentrated, with substantial barriers to entry"; (2) "[t]he nature of the acquirer-processor relationship discourages movement or migrations of merchants (and even [independent sales organizations]) from one processor to another"; and (3) "[a] processor providing both transaction processing and PCI security services . . . disserves the objectives of the PCI Data Security Standard ("PCI DSS")."  Philbin Report, MIL #2 Ex. A, ECF No. 254-2.

In general, experiential witnesses require slightly different considerations than other expert witnesses.  As recently summarized by Judge Grimm of this Court in *Casey v. Geek Squad Subsidiary Best Buy Stores*, 823 F. Supp. 2d 334 (D. Md. 2011):

> The Fourth Circuit "permits not only scientific expert testimony but also 'experiential expert testimony.' " *Touchcon, Inc. v. Berreskin & Parr*, No. 1:07cv114 (JCC), 2010 WL 4393282, at *3 (E.D. Va. Oct. 29, 2010) (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). Experiential testimony need not "rely on anything like the scientific method." *Wilson*, 484 F.3d at 274. Instead, for experiential testimony to be reliable under Rule 702, the expert must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts" of the case. *Id.*

*Casey v. Geek Squad Subsidiary Best Buy Stores*, 823 F. Supp. 2d 334, 345 n.9 (D. Md. 2011).

First Data asserts that Philbin and SecurityMetrics have failed to adequately connect his experience in the industry to his various opinions.  With respect to Philbin's market concentration and barriers to entry opinion, First Data argues that such subjects are economic and data-driven conclusions that are more properly addressed by economists. However, First Data glosses over Philbin's extensive experience in the industry.  Moreover, SecurityMetrics has, in fact, explained how Philbin's specific experiences have led to his

opinions: with respect to market concentration, SecurityMetrics explained Philbin's role in a

major First Data merger:[15]

> As Mr. Philbin testified during deposition, his "experience with
> concentration goes back to" the [Card Establishment Services
> ("CES")] merger that . . . "jump started First Data's successful
> program of establishing joint-venture . . . businesses" and thus
> cemented First Data's role as "a dominant presence within the
> acquiring industry." (Depo. at 112:24–25.) In connection with
> the CES merger, Mr. Philbin—on behalf of First Data, by
> which he was then employed—"worked with an economist that
> was supplied by American Express," (*id.* at 113:7–8), "preparing
> documents to demonstrate that there wasn't a monopoly-type
> issue," (*id.* at 113:2–3). Mr. Philbin witnessed the "massive
> consolidation" fueled by the CES merger, and he has seen it
> persist in the decades since it was accomplished.

Resp. MIL #2 at 17-18, ECF No. 265.   Similarly, with respect to barriers to entry,

SecurityMetrics stated:

> Mr. Philbin's understanding and knowledge of what it takes to
> break into various segments of the industry is such that First
> Data relied on it "during [its] expansion into the merchant
> acquiring side of the business and sharing . . . the risk in the
> revenue," TSYS relied on it when moving "from being a pure
> processor into the risk and revenue that's related to that," and
> "Global Cash Access" and [venture capitalists] still seek him out
> for his advice.  (*See* Depo. at 101:23–102:14.)

Resp. MIL #2 at 18-19, ECF No. 265.  In light of the fact that SecurityMetrics has explained

how specific aspects of Philbin's experience has provided him with an understanding of the

---

[15] In the mid-nineties, First Data purchased Card Establishment Services, a merchant credit card processor allied with Wells Fargo Bank.  "This transaction established First Data and Wells Fargo as partners and jump started First Data's successful program of establishing joint-venture merchant-acquiring businesses with bank partners."  Response MIL #2 15 (quoting Kjos at 12-14).

issues of market concentration and barriers to entry, Philbin will be allowed to testify on those matters.[16]

First Data's protests concerning Philbin's second opinion—pertaining to the infrequency of movement between industry players—lack merit as well. SecurityMetrics explained that Philbin's opinion arose out of his work for TSYS, when Philbin worked to acquire additional portfolios for processing.  *See* Resp. MIL #2, at 20-21 (noting that TSYS targeted portfolios with which TSYS already had a relationship; that some conversions took several years to complete; and that TSYS lost only one ISO to a competitor and did not sign any new ones during Philbin's six year tenure).

Philbin's final opinion—that the PCI DSS is disserved when a processor also supplies compliance services—presents a somewhat different question.  While SecurityMetrics claims that Philbin "'had operational responsibility' for data security at TSYS" and spent a significant amount of time working on PCI DSS-related issues, there has been no explanation of how that experience led to his conclusion on incentives.  Indeed, unlike his other opinions, which are factual assertions based upon his industry experience, Philbin's third opinion is a value-based, subjective judgment.[17]

---

[16] First Data suggests that this testimony should be excluded because the expert testimony of an economist is necessary to adequately prove the types of antitrust claims raised by SecurityMetrics. While this Court finds Philbin is sufficiently qualified to testify on the issues of market concentration and barriers to entry, this Court makes not ruling on the issue of whether Philbin's testimony is sufficient to prove SecurityMetrics' claims; that issue will be addressed at the proper time—on First Data's Motion for Partial Summary Judgment.

[17] Notably, Philbin has not asserted that First Data has violated any actual standard, regulation, or industry custom.

In addition to attacking Philbin's "methodology," First Data also attacks Philbin's reliability, arguing that various passages from Philbin's report were lifted from various publications without any citation.   While this Court does not, of course, condone unattributed copying in expert reports, the circumstances of this case do no merit the total exclusion of Philbin's report and testimony.   First Data has only identified a few such passages, and those passages generally address background issues.[18]   Accordingly, this Court does not find these passages totally discredit Philbin as a reliable expert witness.[19]

Finally, First Data attacks Philbin's testimony under Rule 403 of the Federal Rules of Evidence, which permits the exclusion of evidence where "the probative value is substantially outweighed" by "unfair, prejudice, confusing the issues, [or] misleading the jury."   FED. R. EVID. 403.   In essence, First Data reiterates its earlier arguments and expresses vague concerns about jury confusion.   *See* Mem. Supp. MIL #2, at 20.   In light of this Court's conclusions on First Data's other arguments, this Court does not find that exclusion under Rule 403 is necessary or proper.

---

[18] The Federal Rules suggest that expert testimony on general background facts is subject to less stringent standards than main, substantive facts.  Specifically, the Advisory Committee Notes to the 2000 Amendment of Federal Rule of Evidence ("Rule") 702 states:

> If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably. Yet it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. . . . [E]xperts might instruct the factfinder on . . . principles . . . without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

[19] First Data will, of course, have the opportunity to cross-examine Philbin about these issues.

Thus, in summary, this Court finds that Philbin will be permitted to opine about the issues of market concentration, barriers to entry, and frequency of movement between processors.  Philbin is prohibited, however, from offering his subjective opinion concerning the incentive structure arising when a processor also supplies security compliance services.

### 3.  **First Data's Motion** *in Limine* **#3 – Expert Christopher Pleatsikas**

Dr. Christopher Pleatsikas, an economist, is the Director of the Berkeley Research Group and a lecturer at the University of California, Santa Cruz.  SecurityMetrics engaged Dr. Pleatsikas to assess the anticompetitive effect of four types of "Challenged Conduct": "Specified Minimum" conduct, "Discount" conduct, "Billing Costs" conduct, and "Double Billing and Rebate" conduct.  SecurityMetrics explains the challenged conduct as follows:

> The Specified Minimum and Discount conduct were first testified to by Victor Gerber of Diversified Acquirer's Group ("DAG"), an ISO, on January 10, 2013. First, Mr. Gerber explained, fees paid for First Data's PCI Rapid Comply count toward contractual "minimums" that DAG must meet, while fees paid to SecurityMetrics do not. (Gerber Depo. at 29:3–5, 32:1– 6.) That is the "Specified Minimum" conduct. Second, Mr. Gerber testified that the more revenue DAG generates in excess of its minimums—including PCI Rapid Comply fees but not fees paid to a third-party PCI compliance provider, such as SecurityMetrics—the better the pricing it gets on products other than PCI compliance (such as processing). (Id. at 35:8–12, 35:22–36:4.) That is the "Discount" conduct.
> The third form of ISO-related Challenged Conduct relates to the billing services that First Data provides to ISOs. First Data will handle an ISO's billing of PCI Rapid Comply fees to its merchants at no cost to the ISO. But to handle the billing of fees paid to third-party (i.e., non- PCI Rapid Comply) PCI compliance providers, "[a]n ISO is required to pay between $5,000 and$15,000 per year depending on the size of the ISO plus 50 cents per merchant per month." (Report at ¶ 63, p. 21.) That is "Billing Costs" conduct. In a related vein, "non-compliance fees appear to have been applied differentially depending on whether ISOs used PCI Rapid Comply or decided

to use a third party PCI Compliance," with opt-out ISOs being assessed higher fees for merchants who did not validate their PCI compliance than opt-in ISOs. (Report at ¶ 68, p. 23.) And "it appears that First Data required ISOs using a third party provider of PCI Compliance services to report directly (instead of through the PCI Compliance provider) to First Data," which is an "additional administrative burden . . . cited by some ISOs [as] reasons for using First Data over SecurityMetrics." (Id. at ¶ 69, pp. 23–24.)

That leaves "Double Billing and Rebate" conduct, which has two components. First, "First Data has stated that merchants that use the services of another vendor instead of PCI Rapid Comply will have to pay for those services in addition to paying full cost for PCI Rapid Comply." (Report at ¶ 70, p. 24.) "However, the evidence appears mixed as to whether First Data in practice was providing some level of refunds for Level 4 Merchants that paid to use an alternative provider for PCI Compliance." (Id. at ¶ 73, p. 25.) "To the extent the rebates were provided it appears that these rebates were provided in an amount not equal to the amount charged for Rapid Comply, but instead in an amount equal to the amount paid for the competing PCI Compliance product." (Id. at ¶ 75, p. 26.)

SecurityMetrics' Resp., at 4-5, ECF No. 266.

Dr. Pleatsikas' opinion stated that: "the Challenged Conduct has made it difficult or impossible for rival providers of PCI Compliance services to compete for the supply of these services to some ISOs and/or their merchants. Moreover, the Challenged Conduct would, if allowed to continue and, if applied to a significant fraction of ISOs and/or their merchants, likely make it difficult or impossible for rival providers of PCI Compliance services to compete in the supply of these services." Pleatsikas Report ¶ 14, Mem. Supp. MIL #3 Ex. C, ECF No. 256-4.

First Data's main attack on Dr. Pleatsikas' opinions and testimony is that Dr. Pleatsikas offered no opinion on "antitrust injury" and that, therefore, Dr. Pleatsikas

diverged from his own previous statements that an antitrust injury—i.e., harm to competition rather than simply to a competitor—is necessary to prove an antitrust claim. *See* Mem. Supp. MIL #3, at 4-8, 17-18, ECF No. 256-1. First Data asserts that Dr. Pleatsikas testimony should be excluded on this basis because, in First Data's view, it must have been prepared solely for litigation purposes. *Id.* at 18.

As First Data points out, Dr. Pleatsikas withheld an opinion on antitrust injury; instead, he opined that "[i]f the challenged conduct was widespread, then an economic tie was created between First Data's processing services and its PCI Compliance services." Pleatsikas Report ¶ 90, MIL #3 Ex C, ECF No. 256-4. Thus, the question of the frequency of First Data's conduct has not been determined. SecurityMetrics argues that this issue is a factual question to be submitted to the jury. *See* Resp. MIL #3, at 10-11, ECF No. 266. This Court finds, however, that the adequacy and/or sufficiency of Pleatsikas' opinion as to satisfying its burden of proof is not an issue properly resolved in isolation on a motion *in limine*; instead, these issues are more properly evaluated in the context of a summary judgment motion. Accordingly, this issue will be addressed at the hearing on December 12, 2014.[20]

First Data next criticizes Dr. Pleatsikas' conclusions with respect to market definitions. Dr. Pleatsikas defined the relevant geographical market as the United States, and the relevant product markets as "processor services" and "PCI compliance, validation, and reporting services for Level 4 Merchants using First Data as a processor." First Data asserts

---

[20] Indeed, at this stage, Fist Data has not offered any case law to support the proposition that only one expert must satisfy all the elements to succeed on a claim.

that Dr. Pleatsikas came to those conclusions without any reliable methodology and specifically alleges that Dr. Pleatsikas failed to properly apply the "Hypothetical Monopolist Test." However, First Data's argument ignores Dr. Pleatsikas' explanation of the Hypothetical Monopolist Test, and his prolonged analysis of the relevant markets at issue. *See* Pleatsikas Report, at ¶¶ 34-55. This Court does not find that Dr. Pleatsikas' market definitions to be unsound.

Additionally, First Data protests that the Pleatsikas report relies upon information—specifically, telephone call transcripts—that were not produced during discovery.[21] However, First Data does not dispute that these transcripts have now, in fact, been produced. Moreover, First Data acknowledges that this discovery omission, standing alone, does not "rise to the level of complete exclusion," *see* Reply MIL #3, at 23, ECF No. 283, and this Court agrees with First Data's candid acknowledgement.[22]

Again, First Data alternatively presses for exclusion under Rule 403. And again, First Data merely reiterates it other substantive arguments as reason for exclusion. *See* Mem. Supp. MIL #3, at 23 ("First Data has demonstrated that Dr. Pleatsikas has so failed to ensure a reliable methodology in suggesting antitrust injury and assuming relevant markets,

---

[21] Specifically, First Data's motion references paragraphs 65, 68, and 90 of the Dr. Pleatsikas' expert report. In turn, these paragraphs reference the following transcripts:
1) Direct Connect phone transcript
2) Opt Out phone transcript
3) Petroleum Processing Solutions
4) SurfFirst phone transcript
5) Blackstone phone transcript
6) Clearpay phone transcript
*See* Pleatsikas Report ¶¶ 65, 68, 90.

[22] Nevertheless, First Data asserts that this omission, when "[p]iled on top of all the other serious flaws identified by First Data," constitutes "further reason to exclude Dr. Pleatsikas." Reply MIL 33, at 23. As indicated herein, this Court does not find the other "flaws" to be "serious," and this Court declines First Data's invitation to exclude Dr. Pleatsikas' report, opinions, and testimony.

and offers testimony so attenuated from the facts of this case, that his expert report, opinions, and testimony have no probative value."). Because there is no fatal fault in Dr. Pleatsikas' methodology and because his testimony is clearly relevant, this Court finds no basis for exclusion under Rule 403.

4. **First Data's Motion *in Limine* #4 – Expert Adam Atlas, Esq.**

Mr. Adam Atlas is an attorney who practices law in Canada and New York and who has represented a number of independent sales organizations. In his report, he offers the following opinions: "(1) Small merchants' selection of services, including processor and PCI compliance services, is so heavily influenced by ISOs as to be virtually dictated by them; (2) An interrelated set of business and legal relationships strongly bonds ISOs, processors, and merchants to each other; (3) ISOs prefer to make an independent selection of PCI compliance vendors for their portfolios, rather than having that selection controlled or influenced by processors; (4) Where a processor performs PCI compliance services, rather than outsourcing them, each merchant's likelihood of getting or staying compliant declines." Resp. MIL #4, at 6, ECF No. 268 (citing Atlas Report at 3-5, MIL #4 Ex. A., ECF No. 259-2).

First Data seeks to exclude Atlas' opinions and testimony because, in First Data's view, Atlas used the attorney client privilege to prevent any inquiry into his methodology. *See* Mem. Supp. MIL #4, at 5-8, ECF No. 259-1. SecurityMetrics argues, however, that Atlas asserted the attorney-client privilege only with respect to the identities of his independent sales organization clients and their third-party processors. *See* Resp. MIL #4, at 21, ECF No. 268. SecurityMetrics also points to a number of cases where experienced attorneys were

permitted to provide expert testimony.  *See id.* at 16 (citing *Hanson v. Mutual of Omaha Ins. Co.*, Civ. 01-4238-KES, 2003 WL 26093254, *7 (D.S.D. Apr. 29, 2003) ("Attorneys may testify as experts with respect to insurance industry standards. Present or former employees of the insurance industry are not the only persons qualified to render expert opinions about its operations." (quoting *Klein v. State Farm Mut. Ins. Co.*, 948 P.2d 43, 50 (Colo. Ct. App. 1997)); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3rd Cir. 2006) ("[E]xperienced former counsel for the SEC" permitted to testify about "customs and business practices in the securities industry" but barred from opining on party's compliance "with legal duties that arose under the federal securities laws")).

While Atlas' status as an attorney does not generally bar him from offering expert testimony, the circumstances of this particular case warrant Atlas' exclusion.  Atlas does not seek to offer any testimony about industry standards.  Instead, he seeks to testify about business considerations of independent sales organizations and the market pressures that influence their decisions.  In essence, his testimony would reflect those concerns and considerations that his clients have expressed to him during his representation.  While SecurityMetrics has identified certain situations where attorneys provide expert testimony, it has failed to identify any case where an attorney provided testimony like that which Atlas seeks to provide.  *Cf. Hanson*, 2003 WL 26093254, at *6 ("Opinions based on what [an attorney] thinks are good practices rather than on industry standard amount to speculation and guesswork. Such opinions are neither reliable nor admissible.").  Moreover, Atlas' assertion of attorney-client privilege and client confidentiality has prevented First Data from

fully investigating the basis of Atlas' knowledge and expertise.[23]   Accordingly, Atlas'

opinions, expert report, and testimony will be excluded.

## 5. __First Data's Motion *in Limine* #5 – Expert Clarke Nelson__

Clarke Nelson is a CPA, CGMA, and CFF with an MBA from the Wharton School

of the University of Pennsylvania.  Nelson has opined on the amount of damages in this

case; specifically, he concluded that (1) First Data generated $190,951,243 in "PCI-related

revenues" since June, 2012, which SecurityMetrics seeks to disgorge under its two Lanham

Act claims; and (2) SecurityMetrics suffered $25,374,704 in lost profits due to First Data's

alleged anti-competitive actions.

First Data launches a multitude of assaults on Nelson's opinion.  Again, First Data

leads off with an argument pertaining to causation, asserting that Nelson has failed to offer

any testimony that First Data's alleged actions caused the damages. Like First Data's

argument with respect to Dr. Pleatsikas, this is an argument concerning the sufficiency of

SecurityMetrics' evidence as a whole.  Thus, this Court reserves a ruling on this issue until

the summary judgment stage.

 First Data next launches several attacks on Nelson's methodology, arguing that he

made several errors in his calculations.  First Data first addresses Nelson's calculation of

"PCI compliance-related revenue," which included revenue from ISOs (wholesale and

retail), RSA/Direct (wholesale and retail) and non-validation fees.  First Data suggests that

Nelson simply added up the columns without any understanding or analysis of the data.  In

---

[23] Although SecurityMetrics contends that the assertion of privilege and/or confidentiality has been limited to only his clients' identities, this Court finds that such information is important—and indeed necessary—in order for First Data to have any meaningful investigation into the foundation of Atlas' experience.

addition, First Data suggests that Nelson did not review the deposition transcript of First Data's Rule 30(b)(6) witness on the issues of fees, costs, and charges[24] before finalizing his expert report.[25]  Specifically, First Data argues that, had Nelson reviewed the transcript, he would have realized that the "wholesale" and "retail" revenue columns represented different figures which should not have both been included in Nelson's PCI compliance-related revenue calculation.[26]  Finally, First Data protests that non-validation fees should not have been included in the calculation of PCI compliance-related revenue.

After review of the parties' submissions, this Court is not convinced that exclusion of Nelson's testimony on these grounds is necessary or appropriate.  Although First Data couches its complaint as one of faulty methodology, First Data's argument essentially attacks Nelson's conclusions on the basis that it believes Nelson miscalculated and came to an incorrect conclusion.  Of course, this is not a reason to exclude expert testimony.  *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  Moreover, it is notable that First Data complains about Nelson's use of a chart that First Data itself produced—and which is not a particular example of clarity.  To the extent that First Data believes that Nelson's calculations were over-inclusive, it will be able to attempt to demonstrate as much on cross-examination and through rebuttal witnesses.

---

[24] Jason Brown, the Finance Manager for First Data, served as First Data's Rule 30(b)(6) witness on the issue of fees, costs, and charges.

[25] Specifically, First Data asserts that the deposition transcript was emailed to all counsel on July 29, two days before the July 31 expert report deadline.

[26] With respect to ISO revenues, First Data contends that "ISO wholesale revenue (fees First Data charged to– not collected from–ISOs) is distinct from ISO retail revenue (representing fees that ISOs charged to their merchants from which First Data receives nothing)."  MIL #5, at 11.  Similarly, First Data asserts that it bills only the retail revenue to its merchants and not the wholesale revenue.  *See id.* at 12.

First Data also asserts that Nelson "double-counted" First Data's alleged illegal profits and SecurityMetrics' alleged lost profits and argues that, as a matter of law, SecurityMetrics cannot recover both measures of damages if it were to prevail on both the Lanham Act and antitrust claims.   In opposition, SecurityMetrics points to *Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007 (9th Cir. 1994), where the United States Court of Appeals for the Ninth Circuit affirmed an award of damages for both trademark and copyright infringement in a case where the defendant had falsely marketed video game cartridges (which contained some, but not only, games copyrighted by Nintendo) as a Nintendo product.   *Id.* at 1009.   While the Ninth Circuit did not find the district court's award constituted a "double recovery" in that particular case, *see id.* at 1010, other cases have barred recovery of some portion of damages on such a basis.   *See, e.g., Manufacturers Technologies, Inc. v. Cams, Inc.*, 728 F. Supp. 75 (D. Conn. 1989).   This Court does not see the need to resolve this issue at this time, as the double-counting issue is a legal question of damages.   Thus, the issue will not arise until SecurityMetrics perseveres on one or more of its counterclaims.   Nor does it appear to the Court, at least at this time, that Nelson's opinions and report risk confusing the jury because Nelson clearly distinguished between his analysis of First Data's profits with respect to the Lanham Act and SecurityMetrics' lost profits with respect to the antitrust claims.[27]

---

[27] First Data also argues that Nelson failed to properly disaggregate the damages as they related to the various individual counterclaims.   *See* Reply MIL #5 (citing *Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 182 F. App'x 267 (4th Cir. May 31, 2006) (unpublished) and discussing *Comcast Corp. v. Behrend*, --- U.S. ----, 133 S. Ct. 1426 (2013)).   While both cases address the issue of lump sum damage calculations, those cases do not alter the Court's conclusion at this time.   Notably, in *Pharmanetics*, the district court had already awarded summary judgment on some of the claims while the damages had been calculated as if the plaintiff had prevailed on those claims.   Similarly, in *Comcast Corp.*, the United States Supreme Court specifically relied upon the fact that the damages calculation addressed four theories of liability but that only one of those

First Data also attacks Nelson's opinions and report based upon his failure to consider alternative reasons, *see* Mem. Supp. MIL #5, at 13; in its Reply brief, First Data also suggests that Nelson did not apply a proper "before and after" analysis to assess lost profits, *see* Reply MIL #5, at 4-9. Nelson's report, however, reflects a complex analysis that included calculation and consideration of SecurityMetrics' natural attrition and penetration rates and a variety of other factors. *See* Nelson Report 31-45. Nelson's calculations were not as simplistic as First Data would have this Court believe, and any errors or omitted factors are of course potential topics for cross-examination. Quite simply, Nelson's calculations are not so methodologically flawed to warrant their total exclusion.[28]

### 6. First Data's Motion *in Limine* #6 – Declaration of Brandon Bastion, Esq., Chart of Phone Calls, and Schedule 16

First Data's sixth and final Motion *in Limine* relates to various attachments to Nelson's report. Specifically, the Nelson report that was produced on July 31, 2014 included several attachments, among which were (1) the declaration of attorney Brandon Bastian (in-house counsel for SecurityMetrics) and (2) a chart listing a number of telephone call recordings of conversations between SecurityMetrics employees and various merchants and

---

theories remained at issue in the case. *See Comcast Corp.*, 133 S. Ct. at 1434 ("This methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case."). In this case, however, there has been no ruling on the various motions for summary judgment and all of the relevant theories still remain at issue in the case.

[28] First Data's final arguments—that exclusion is proper due to Nelson's incorporation of the report of Michael Belch or due to the prejudicial effect on First Data under Rule 403—are also unavailing. Nelson's report spends a mere two paragraphs discussing Belch's report, which this Court has already excluded, and that discussion is just one aspect of the discussion of First Data's alleged conduct. First Data's Rule 403 argument does not raise any new issues and the above analysis adequately addresses the issues raised in its three sentence argument with respect to Rule 403.

First Data's argument with respect to Schedule 16 and some of the other attachments to Nelson's report will be addressed in connection with First Data's sixth Motion *in Limine*.

Moreover, it also worth noting that the Court has permitted First Data to re-depose Nelson.

ISOs.  On September 17, 2014, Nelson also produced "Schedule 16," which listed the same calls identified in the chart but reorganized the calls based upon their content.  Additionally, Schedule 16 contained information regarding the callers' status as a SecurityMetrics customer.

First Data seeks to exclude these documents because, in its view, those documents— or at least the information contained therein—should have been disclosed earlier.  Specifically, First Data asserts that SecurityMetrics failed to identify Bastian as a potential witness.  Additionally, First Data asserts that the calls identified in the chart and Schedule 16 should have been identified in SecurityMetrics' responses to First Data's interrogatories and document requests.  First Data also contends that SecurityMetrics' Rule 30(b)(6) deponent on damages, SecurityMetrics' CEO Bradley Caldwell, should have provided the information during his deposition.[29]  First Data suggests that SecurityMetrics has "sandbagged" by refusing to identify the specific calls and/or merchants during fact discovery and has instead only revealed the information as part of an expert report.  First Data suggests that it has been prejudiced because it cannot possibly investigate the calls before trial (scheduled to begin January 12, 2015).

In opposition, SecurityMetrics asserts that the chart was not made until late July 2014 and was timely disclosed soon after its creation.  Accordingly, SecurityMetrics argues that it complied with Rule 26 because it provided timely supplementation of its earlier responses.  Moreover, SecurityMetrics characterizes the chart as summary table subject to Rule 1006 and

---

[29] First Data contends that this failure was particularly meaningful because this Court allowed First Data to interview Mr. Caldwell again under Rule 30(b)(6) on the issue of damages following the June 18-19, 2014 hearing.  *See* June 20, 2014 Letter Order ¶ 10, ECF No. 245.

argues that, because the actual recordings were previously disclosed, it had no obligation to also disclose the chart and Schedule 16.

Even if this Court takes SecurityMetrics at its word, however, SecurityMetrics' position is problematic.  Rule 30(b)(6) imposes affirmative obligations upon corporations and their designated deponents.  Specifically, "the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved." *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 487 (D. Md. 2005) (quoting *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996)).  Indeed, the rule requires affirmative action on the part of the corporation to educate its designee on issues outside of that particular individual's personal knowledge.  *See Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d at 487 ("If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation." (quoting *Taylor*, 166 F.R.D. at 361)); *see id.* (noting that the rule "implicitly requires [Rule 30(b)(6) deponents] to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition" (quoting *Taylor*, 166 F.R.D. at 362)); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 238 (D. Md. 2010) ("[T]he corporation is expected to *create* a witness or witnesses with responsive knowledge, and in doing so must make a good faith effort to find out the relevant facts—to collect information, review documents, and interview employees with personal knowledge." (internal quotation marks omitted)).  As recognized by this Court and many others, this interpretation of the rule "is

necessary in order to make the deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial." *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d at 487 (quoting *Taylor*, 166 F.R.D. at 362).

In this case, SecurityMetrics designated Bradley Caldwell as its Rule 30(b)(6) deponent on the issue of damages.  One of the documents that Caldwell brought with him was Exhibit 355, which is a half-page document titled "Lost Unique Merchants."  The document contained the following text:

> About 100 calls with merchants and ISOs discussing FD PCI compliance fees – Lizzie's Nest Bed and Breakfast in Fairbanks, Alaska
>
> About 100 calls from merchants stating PCI Rapid Comply is free – Flying Pig Saloon
>
> About 100 calls with false statements from FD – McGuire Group LLC (March 26 hearing)
>
> About 50 calls from FD implying SM has no right to the merchant data – Wima Networks (March 26 hearing)

Mem. Supp. MIL #6 Ex. L, ECF No. 263-5.  Each category pertains to alleged wrongful conduct by First Data, and the information after the dash in each line reflects an example of a specific merchant who allegedly raised that issue during a call with SecurityMetrics. Caldwell was unable to identify additional recordings beyond those examples.  The following exchange from his deposition is illustrative of Caldwell's knowledge of the recordings:

> Q.  [First Data's Counsel]: Is there a list of these 100 calls anywhere?
> A.  [Caldwell]: I believe there is, yes.  I think they were all produced for you already.

Q.    When you say there were all produced, are they produced, to your knowledge, segregated so that these hundred – approximately 100 calls are separate and apart from other calls?

A.    I don't know the answer to that.

Q.    Have you ever seen a list of these approximately 100 calls?

A.    I haven't.

Q.    Who provided this information to you to enable you to prepare Exhibit 355?

A.    Brandon Bastian.

Q.    For each of the approximately 100 calls referenced in the portion that we're reading there discussing First Data PCI compliance fees, at the time of the call, was each merchant – and I'm just referring to merchants, not ISOs – was each merchant then a current paying customer of First Data – of SecurityMetrics?

A.    I don't know the answer to that.

Q.    On each of these 100 calls, did the merchant say that they were not going to use SecurityMetrics' services?

A.    I don't believe so.  I think they were confused and asking us about the compliance fees.

. . . .

Q.    Of these approximately 100 merchants and ISOs, how many of them are currently customers of SecurityMetrics?

A.    I don't know the answer to that.

. . . .

Q.    Is there any way that you know of that SecurityMetrics can determine, of those approximately 100 calls, how many merchants are currently customers of SecurityMetrics?

A.    Yes.

Q.    How would SecurityMetrics do that?

A.    We would listen to each of the calls, obtain the merchant information, and look them up to see if they have left or not.

Q.    Has SecurityMetrics done that?

A.    We may have.  I'm not sure.

Caldwell July 16, 2014 Depo. 10:6 – 13:13, Resp. MIL #6, ECF No. 279-1.  Elsewhere, First

Data's counsel inquired about customers lost due to alleged false and misleading statements:

Q.    Can you – can SecurityMetrics identify the name of even one merchant who left as a result of any false and misleading statement listed under that heading on Exhibit 356?

A.    Yes, McGuire Group LLC.

Q.    Any others?

> A.      I don't' have any others here in front of me.  I don't
> memorize these lists.
> Q.      Well, did you try to make a list in preparation for your
> deposition today?
> A.      Of examples of each merchant?  I didn't try to bring a list
> of every merchant – what I tried to do was bring a list of each
> merchant who left so you had a complete list.
>          I didn't try to break it out into these different
> classifications, no.

*Id.* at 39:8-23.

As these passages indicate, SecurityMetrics—through its Rule 30(b)(6) deponent Bradley Caldwell—was unable to specifically identify merchant customers that it lost due to First Data's various alleged "bad acts."  Both the chart and Schedule 16 reflect an attempt to identify specific affected merchants and categorize the calls based upon the various alleged "bad acts."   Even if these categorizations were not created until after the Caldwell deposition, as SecurityMetrics contends, that delay would constitute a violation of Rule 30(b)(6)'s requirement of educating its representative in advance of the deposition.  Whether intentional or not, SecurityMetrics has effected an end-run around Rule 30(b)(6) and now seeks to supplement its testimony on the issue of damages and avoid binding itself to the few specific incidents identified by Caldwell during his Rule 30(b)(6) deposition.  Thus, as noted in this Court's November 10, 2014 letter order (ECF No. 292), SecurityMetrics will be bound by its Rule 30(b)(6) testimony.[30]  To the extent that SecurityMetrics seeks damages, it must tie its claim to specific testimony from the deposition transcript (or evidence contained

---

[30] SecurityMetrics' argument with respect to Rule 1006 of the Federal Rules of Evidence does not change the Court's analysis.  The question is not whether the recordings identified in the chart and Schedule 16 had been previously produced to First Data; the question is *when* SecurityMetrics identified those recordings as the basis for First Data's liability and SecurityMetrics' alleged damages.

in other exhibits from that deposition),[31] and First Data's Motion *in Limine* to Exclude the Bastian Declaration, the chart, and Schedule 16 will be granted.

CONCLUSION

For the reasons stated above, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Michael Belch, Ph.D. (ECF No. 253), Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Adam N. Atlas, Esq. (ECF No. 259), and First Data's Motion *in Limine* to Exclude the Declaration and Testimony of Attorney Brandon L. Bastian and Certain Other Related Documents (ECF No. 262) are GRANTED. Additionally, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Robert J. Philbin (ECF No. 254) is GRANTED IN PART and DENIED IN PART; specifically, the motion is granted with respect to his third opinion that "the objectives of the PCI Data Security Standard" are disserved when a processor provides both transaction processing and PCI compliance services and the motion is denied with respect to Philbin's opinions about market concentration, barriers to entry, and frequency of movement between processors. Finally, First Data's Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Christopher Pleatsikas, Ph.D. (ECF No. 256) and Motion *in Limine* to Exclude the Expert Report, Opinions, and Testimony of Clarke B. Nelson (ECF No. 260) are DENIED.

---

[31] While the Court acknowledges that the sanction here is somewhat harsh, the Court finds it appropriate under the circumstances presented here. After First Data alleged that Caldwell was unprepared for his original Rule 30(b)(6) deposition, this Court essentially afforded SecurityMetrics a "mulligan" by permitting an additional Rule 30(b)(6) deposition on the issue of damages. While the Court did not order any cost-shifting with respect to that second deposition, the Court warned SecurityMetrics that it would be bound by Caldwell's testimony.

A separate Order follows.

Dated:          December 3, 2014                    _____/s/_____
                                                    Richard D. Bennett
                                                    United States District Judge