IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| FIRST DATA MERCHANT SERVICES CORPORATION, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-12-2568 |
| SECURITYMETRICS, INC., | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

In this litigation, now in the post-judgment phase, Plaintiffs and Counter-Defendants First Data Merchant Services and First Data Corporation (collectively, "First Data") and Defendant and Counterclaimant SecurityMetrics, Inc. ("SecurityMetrics") continue their battle of motions. As this Court has previously noted, the origins of this case lie in a soured business relationship and the settlement of earlier litigation in the United States District Court for the District of Utah.

In that previous litigation, First Data sued SecurityMetrics for injunctive relief relating to the method in which SecurityMetrics provided its security compliance reports to First Data. After First Data's motion for a preliminary injunction was denied, the parties entered mediation and signed a one page settlement (known as "the Terms of Settlement"). Despite the fact that First Data had initiated the lawsuit, First Data tendered a settlement payment of $5 million to SecurityMetrics. Shortly thereafter, First Data initiated this lawsuit in this

1

Court, alleging various forms of misconduct by SecurityMetrics following the settlement. SecurityMetrics subsequently asserted fifteen counterclaims sounding in various doctrines of contract, trademark, and antitrust law.  After a long and contentious discovery period, the parties submitted cross-motions for summary judgment.  On December 30, 2014, this Court issued a ruling on those motions that effectively narrowed the scope of issues to contractual issues arising from the parties' settlement agreement and one tortious interference claim asserted by First Data against SecurityMetrics.  This Court granted summary judgment to First Data on some of SecurityMetrics' counterclaims for, *inter alia*, violations of the Lanham Act and the Utah Truth in Advertising Act, tortious interference, and antitrust violations. The parties continued their preparation for what had been scheduled as a jury trial to commence on January 12, 2015.

On the Sunday before the start of trial, specifically January 11, 2015, the parties notified the Court that they had reached an agreement as to several of the remaining claims. Thus, the only claims to be tried were the parties' competing claims for declaratory relief as to the meaning of the "merchant data provision" of the Terms of Settlement.[1] Additionally, the parties stipulated to a bench trial of these remaining claims.  After a two-day bench trial, this Court entered its findings of fact and conclusions of law on January 22, 2015, finding in favor of SecurityMetrics and ruling that the Terms of Settlement permitted SecurityMetrics

---

[1] These were First Data's first claim and SecurityMetrics's fourth counterclaim.  The claims sought to determine whether the Terms of Settlement granted SecurityMetrics the right to use data from merchants whom it had previously enrolled in its services or whether that right extended to all merchants whose information had been provided to SecurityMetrics by First Data (i.e., enrolled *and* unenrolled merchants).

to solicit merchants who had previously enrolled in its services *as well as* those who had not. *See* Jan. 22, 2015 Mem. Op., 20-21, ECF No. 381.

Currently pending before this Court are First Data's Motion for Attorney Fees (ECF No. 386), SecurityMetrics' Motion for Attorney Fees (ECF No. 388), SecurityMetrics' Motion for Relief Under Federal Rule of Civil Procedure 59 (ECF No. 390), SecurityMetrics' Motion for Leave to File Audio Recording as Exhibit (ECF No. 393), and SecurityMetrics' Motion to Strike New Evidence on Reply (ECF No. 407).  The parties' submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons that follow, SecurityMetrics' Motion for Leave to File Audio Recording as Exhibit (ECF No. 393) is GRANTED, but its Motion for Relief Under Federal Rule of Civil Procedure 59 (ECF No. 390) is DENIED.  First Data's Motion for Attorneys' Fees (ECF No. 386) is DENIED, and SecurityMetrics' Motion to Strike New Evidence on Reply (ECF No. 407) is DENIED AS MOOT.  Finally, SecurityMetrics' Motion for Attorneys' Fees (ECF No. 388) is construed as WITHDRAWN.

## BACKGROUND

### A.  The Relationship of the Parties

First Data is a global payment processor engaged in the business of processing credit and debit card transactions for merchants and independent sales organizations ("ISOs") who use First Data's card processing services.[2]  Within the payment card industry, merchants

---

[2] In the payment card industry, there are a few main types of service providers.  An "issuer" issues a payment card to a consumer and bills and collects amounts due from the consumer.  The other main service is

who accept payment cards must comply with certain data security requirements.[3] SecurityMetrics provided data security compliance services to some merchants for whom First Data provided processing services.

For several years, the parties worked together pursuant to a contractual relationship.[4] Under those agreements, First Data promoted SecurityMetrics to its Level 4 merchant customers as its preferred vendor for services relating to validation of compliance with PCI Standards, and SecurityMetrics developed and utilized a protocol for reporting validation of compliance through what is known as the "START" system.  Under the terms of the agreement, First Data paid SecurityMetrics for each merchant that was enrolled (usually for a one year service period), and SecurityMetrics would report the compliance status of all its enrolled merchants to First Data on a monthly basis.   First Data terminated the agreement

---

provided on the merchant side; when a consumer attempts to pay a merchant for goods or services with a payment card, an "acquirer" obtains authorization for the transaction from the consumer's issuer and then clears and settles the transaction so that the merchant gets paid and the consumer's account gets charged. Acquirers perform the underwriting requirements and take on the financial risks of fraud.   In addition, some payment card brands or associations operate in open networks that allow separate entities or banks to operate as issuers and acquirers; in such open networks, "processors" help to facilitate the communication and settlement of payment.  FDMS is an acquirer, while FDC is the payment processor for FDMS's transactions.

[3] The PCI Data Security Standard ("PCI Standard" or "PCI DSS"), which was developed by the PCI Security Standards Council, has been adopted by the major credit card brands as their data security compliance requirement for all merchants.  Thus, the card brands enforce compliance with the PCI Standard and determine the penalties for non-compliance.  While the PCI Standard's requirements vary based upon the size of a merchant, the category of merchants at issue in this case are "Level 4 merchants."   Under PCI Standard, Level 4 merchants, who have a lower volume of transactions, must complete the Self-Assessment Questionnaire ("SAQ"). The SAQ is a validation tool intended to assist merchants in self-evaluating their compliance with the PCI Standard.  For those Level 4 merchants who conduct sales over the internet, however, the PCI Data Security Standard requires vulnerability scans of its computer system.  These scans must be performed by Approved Scanning Vendors ("ASV"), which are approved by the PCI Council.

[4] For purposes of this Memorandum Opinion, the relevant documents include the original January 2008 contract (the "Master Services Agreement") (ECF No. 275-2) and a separate "Statement of Work" (ECF No. 275-3), and the 2011 Amendment to the Master Services Agreement (ECF No. 275-5).

between the parties in May 2012.[5]  Since that point, SecurityMetrics ceased START reporting

and began to send emails containing links to PDF reports of compliance.

In May of 2012, FDMS filed suit in *First Data Merchant Services Corporation v.*

*SecurityMetrics, Inc.*, Case No. 2:12-cv-495 ("Utah Action") in the United States District Court

for the District of Utah ("Utah Court") and moved for a temporary restraining order and

preliminary injunction requiring SecurityMetrics to resume START reporting.  The Utah

Court denied the motion, and the parties entered mediation, which resulted in the signing of

Terms of Settlement ("Settlement Terms") by both parties.  Under those terms, First Data

after having brought the action, instead proffered a payment of five million dollars to

SecurityMetrics.

In June of 2012, First Data began offering a service called "PCI Rapid Comply,"

which competes with the services offered by SecurityMetrics.[6]

## B.  The Presently Pending Action

On August 27, 2012—less than three months after the signing of the Terms of

Settlement—First Data filed the presently pending action before this Court.  Following a

stay of this action pending final disposition of a second Utah Action[7] and the subsequent

denial of FDMS's Preliminary Injunction Motion filed before this Court, FDMS was

---

[5] According to First Data, the event that precipitated the falling-out was First Data's instruction to
SecurityMetrics to stop using the data provided by First Data for out-bound solicitations to Level 4
merchants. First Data believes that this action was consistent with the contract.  First Data alleges that,
thereafter, SecurityMetrics accused First Data of breaching the contract, cut off First Data's access to
SecurityMetrics' interactive database, and stopped submitting PCI compliance reports with the START feeds.
[6] By representation of counsel, this service is no longer offered.
[7] SecurityMetrics initiated a case in the U.S. District Court for the District of Utah—*SecurityMetrics, Inc. v. First
Data Merchant Services Corp.*, No. 2:13-cv-149 (D. Utah)—in early 2013.

permitted to amend its Complaint (ECF No. 91).  As a result, First Data filed the Amended

Complaint (ECF No. 92) on March 8, 2013, which asserted the following claims:

1) Declaratory relief (Count 1)

2) Breach of contract (Count 2)

3) Common Law Unfair Competition (Count 3)

4) Tortious Interference with Existing and Prospective Contractual and Business Relationships (Count 4)

5) Injurious Falsehoods (Count 5)

6) False Endorsement/Association, Lanham Act 15 U.S.C. § 1125(a)(1)(A) (Count 6)

7) Trademark/Service Mark/Trade Name Infringement, Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a)(1)(A) (Count 7)

8) False Advertising, Lanham Act, 15 U.S.C. 1125(a)(1)(B) (Count 8)

9) Declaratory Relief (Count 9)

SecurityMetrics answered the Complaint on August 26, 2013 and asserted fifteen

counterclaims of its own against First Data, including claims for:

1) Specific performance of the first paragraph of the Terms of Settlement (Obligation to Enter Long-Form Settlement) (Count 1)

2) Declaratory judgment with respect to third paragraph of the Terms of Settlement (Merchant Data provision) (Count 2)

3)  Declaratory judgment with respect to fifth paragraph of the Terms of

Settlement (Unenforceability of Confidentiality Term) (Count 3)

4)  Injurious falsehoods (Count 4),

5)  Federal false advertising (Count 5),

6)  Federal false endorsement (Count 6),

7)  Cancellation of registration (Count 7),

8)  Utah Truth in Advertising Act violations (Count 8),

9)  Tortious interference (Count 9),

10) Federal restraint of trade (Count 10),

11) Federal monopolization and attempted monopolization (Count 11),

12) Maryland Restraint of Trade (Count 12)

13) Maryland monopolization and attempted monopolization (Count 13)

14) Maryland predatory pricing (Count 14), and

15) Maryland tying (Count 15).

First Data's Motion to Dismiss Certain of Defendant's Counterclaims (ECF No. 163), filed on September 19, 2013, targeted only a few of these counts.  That Motion was denied with the exception of SecurityMetrics' attempt to assert monopolization claims in Counts Eleven and Thirteen. (The attempted monopolization claims, however, were permitted to proceed).

After a contentious discovery period, the parties filed cross-motions for summary judgment.[8]  This Court conducted a hearing on the motions on December 12, 2014.  First Data's claims for unfair competition and injurious falsehoods were withdrawn during that proceeding.  After considering the parties' arguments from their papers and the hearing, this Court issued a Memorandum Opinion and separate Order (ECF Nos. 343 & 344) on December 30, 2014 addressing the remaining issues raised by the various motions.  Specifically, with respect to the contract-related issues, this Court denied SecurityMetrics' motion for summary judgment as to the meaning of the "merchant data" provision of the Terms of Settlement (addressed in Counts 1 and 2 of First Data's Amended Complaint and Count 2 of SecurityMetrics' Counterclaims).  The Court did, however, grant summary judgment to First Data with respect to SecurityMetrics' first counterclaim, which sought to enforce a draft version of a long-form settlement agreement that was circulated among the parties after the Terms of Settlement were signed.  Next, this Court denied SecurityMetrics' motion for summary judgment as to First Data's tortious interference claim arising out of the format of SecurityMetrics' compliance reports.  With respect to SecurityMetrics' counterclaims, this Court entered summary judgment in favor of First Data because this Court found that the statements of which SecurityMetrics complained were misleading rather than clearly false and lacked the requisite supporting evidence to allow them to

---

[8] The parties also submitted numerous motions *in limine*, which this Court considered and ruled upon in the weeks leading up to trial.

proceed to trial.[9]  This Court adjudicated the Utah Truth in Advertising Act counterclaim for similar reasons.  This Court then found that the evidence supporting Counts 4 and 9 of SecurityMetrics' counterclaims was inadmissible hearsay; as a result, there was no admissible evidence supporting those claims, and this Court therefore awarded partial summary judgment to First Data.  Finally, this Court granted summary judgment to First Data with respect to SecurityMetrics' antitrust claims because this Court found that no reasonable jury could find that SecurityMetrics had shown injury to competition.

After the hearing on the motions for summary judgment, the parties submitted a Consent Order, signed by this Court on December 22, 2014, that resolved Counts 6, 7, and 8 (Lanham Act claims) of First Data's Amended Complaint.  *See* Consent Order, ECF No. 334.  On the Sunday before the start of trial—January 11, 2015—the parties filed a Stipulation of Dismissal as to Counts 2, 4, and 9 of First Data's Amended Complaint and Counts 3 and part of Count 2 of SecurityMetrics' Counterclaims.[10]  Accordingly, the only claims that remained for trial were the competing declaratory judgment claims addressing SecurityMetrics' right to solicit merchants under the "merchant data provision" of the Terms of Settlement.

---

[9] This Court excluded the expert testimony and report of Dr. Michael Belch, who had opined that "if PCI Rapid Comply is not approved or certified by the PCI Council, the consumer (merchant) is being deceived and harmed by the creation of a false sense of security, and the fact that they are paying for a service they are not receiving." Belch Report ¶ 23, MIL #1 Ex. A, ECF No. 253-2. In reaching its conclusion, this Court noted that Dr. Belch had failed to employ a control, had removed the original context of the marketing material, and had failed to account for other causes of consumer confusion.

[10] These claims largely addressed the method and format of SecurityMetrics' compliance reporting to First Data. SecurityMetrics' third counterclaim, however, sought a declaration that the confidentiality term of the Terms of Settlement was unenforceable. This claim became moot due to the presumption of openness of court records upon this Court's ruling on the motions for summary judgment.

This Court held a two-day bench trial on January 12 and 13, 2015.  The only witness called by either party was SecurityMetrics' CEO Bradley Caldwell.  No witness representing First Data testified.  After considering the evidence submitted at trial and the arguments of counsel, this Court found that the term "Merchant Data," as used in the "Merchant Data" provision of the Terms of Settlement, included information and data relating to so-called Unenrolled Merchants.    Accordingly,  this  Court  entered  judgment  in  favor  of SecurityMetrics and against First Data.

Following trial, despite the clear failure of most of its claims, First Data filed its currently pending Motion for Attorneys' Fees (ECF No. 386), seeking $764,555.60 in attorneys' fees, plus an additional $12,534.51 in expenses. While these fees and expenses related to the entire litigation, the rationale of First Data's motion is that it had prevailed on its defense of the Lanham Act and Utah Truth in Advertising Act claims.  SecurityMetrics also filed a Motion for Attorneys' Fees (ECF No. 388), which were in the total amount of $44,213.75 and pertained only to fees incurred in trying the merchant data issue. Subsequently, SecurityMetrics filed a Motion for Relief Under Federal Rule of Civil Procedure 59 (ECF No. 390) and a Motion to Strike New Evidence on Reply (ECF No. 407).[11]

ANALYSIS

## I.    <u>SecurityMetrics' Motion for Relief Under Rule 59</u>

---

[11] SecurityMetrics also filed a Motion for Leave to File Audio Recording as Exhibit (ECF No. 393), which will be GRANTED.

### A. Standard of Review

Rule 59 of the Federal Rules of Civil Procedure provides an avenue for litigants to seek a new trial under Rule 59(a) or to alter, amend, or vacate a prior judgment under Rule 59(e). *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 470 n.4 (4th Cir. 2011). SecurityMetrics has filed the currently pending motion under Rule 59(a) and expressly requests a new trial on its Fifth, Eighth, Ninth, Tenth, and Eleventh Counterclaims. *See, e.g.,* SM's Mem. Supp. Mot. Relief FRCP 59 at 1, ECF No. 390-1. However, all five of those counterclaims were summarily adjudicated by this Court's December 30, 2014 Memorandum Opinion & Order (ECF Nos. 342 & 343). Accordingly, the proper standard to be applied to SecurityMetrics' motion is that of Rule 59(e). *See Reaves v. City of Mullins*, Civ. A. No. 4:07-3559-TLW-TER, 2009 WL 4919503, at *1 (D.S.C. Dec. 11, 2009) (noting that Rule 59(a) was inapplicable because case was decided on summary judgment but nevertheless considering the motion under Rule 59(e)); *see also Delaney v. Marsh*, No. 7:08CV00465, 2012 WL 1339741, at *1 (W.D. Va. Apr. 17, 2012) (construing motion under Rule 59(a) as a motion under Rule 59(e) challenging denial of Plaintiff's summary judgment motion); *Reid v. EG&G Technical Servs. Inc.*, No. 2:10cv448, 2011 WL 4829969, at *2 (E.D. Va. Oct. 12, 2011) (finding motion pursuant to Rule 59(a) be moot and, alternatively, construing the motion as one under Rule 59(e)).

The United States Court of Appeals for the Fourth Circuit has repeatedly recognized

that a final[12] judgment may be amended under Rule 59(e) in only three circumstances: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.  *See, e.g.,* *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 241 n.8 (4th Cir. 2008).  Such motions do not authorize a "game of hopscotch," in which parties switch from one legal theory to another "like a bee in search of honey."  *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003).  In other words, a Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment."  *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (quoting 11 Wright, *et al.*, *Federal Practice and Procedure* § 2810.1, at 127-28 (2d ed. 1995)).  Where a party presents newly discovered evidence in support of its Rule 59(e) motion, it "must produce a legitimate justification for not presenting the evidence during the earlier proceeding."  *Id.* (internal citations and quotation marks omitted).  Where a party seeks reconsideration on the basis of manifest error, the earlier decision cannot be "'just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week old, unrefrigerated dead fish."  *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*, Nos. 92-2355, 92-2437, 1995 WL 520978 at *5 n.6 (4th Cir. Sept. 5, 1995)).  "In general, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."  *Id.* (internal citations and quotation marks omitted).

---

[12] Rule 59(e) applies only to final judgments.  *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991).

## B.  Lanham Act False Advertising Counterclaim

The Lanham Act prohibits commercial entities from making false statements in their advertising.  Specifically, § 43(a)(1)(B) of the Act states that:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading representation of fact, which . . . , in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  Thus, the Act provides a "private remedy for a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising." *Made in the USA Foundation v. Phillips Foods, Inc.*, 365 F.3d 278, 281 (4th Cir. 2004) (quoting *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993)).   One of the elements for proving a false advertising claim under the Lanham Act is that the "defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product."[13]  *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United*

---

[13] The other elements are :
> (1) the misrepresentation is material, in that it is likely to influence the purchasing decision; (2) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the defendant placed the false or misleading statement in interstate commerce; and (4) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United Industries*, 315 F.3d 264, 272 (4th Cir. 2002)).

*Industries*, 315 F.3d 264, 272 (4th Cir. 2002)). With respect to the false or misleading nature of the statement, the advertisement may be "literally false" or an "implied falsehood" that "tend[s] to mislead or confuse consumers." *Id.* (citations omitted). In the case of literal falsehoods, a claimant need not allege nor prove evidence of consumer deception; an implied falsehood, however, requires extrinsic evidence of confusion or deception. *Id.*

SecurityMetrics' false advertising claim addressed two statements made as part of First Data's promotional materials on its website; essentially, those statements suggested that merchants would pay a fee to First Data regardless of whether the merchant used PCI Rapid Comply or a third party vendor for data security compliance services.[14] *See* Countercls. ¶ 112.[15] SecurityMetrics asserts that these statements are actionable under the Lanham Act

---

[14] The statements at issue are as follows:

> If you choose to use a third-party vendor for PCI DSS compliance services, you will need to contract with and pay that vendor directly. In addition to your alternate vendor's charges for PCI DSS compliance services, you still will need to pay the Compliance Service Fee charged to you by your merchant services provider. The Compliance Service Fee is not affected by your choice to use a third-party vendor.
>
> If First Data's PCI compliance services are contractually available to you, you will be charged an applicable annual compliance fee for those services, regardless of whether you use them or utilize the services of some other third-party PCI compliance services vendor. If you utilize the additional services of a third party vendor, you will pay that third party vendor's charges for those fees in addition to First Data's annual compliance fee.

Countercls. ¶ 112.

[15] SecurityMetrics suggests that First Data simply ignored the first statement identified by First Data (and particularly the statement that "[t]he Compliance Service Fee is not affected by your choice to use a third-party vendor."). In its papers, SecurityMetrics argued that First Data's motion should be denied to this first statement because "First Data has not even addressed this other advertisement in its opening brief—and First Data should not be permitted to do so, for the first time, on reply." Reply 6, ECF No. 298. SecurityMetrics reiterated this position at the December 12, 2014 hearing.

Considering that SecurityMetrics presented arguments regarding the first statement, it is clear that SecurityMetrics was aware that First Data's Motion was directed at both statements. Indeed, as First Data points out, First Data's motion cites to both statements, and the statements contain similar content.

because First Data actually provided refunds to merchants who used third-party compliance vendors in the amount of the third-party vendor's fee.

In its Memorandum Opinion, this Court awarded summary judgment to First Data on SecurityMetrics' false advertising Lanham Act counterclaim.  Specifically, this Court ruled that the statements were not literally false and were, at best, misleading.  Applying the principle from *PBM Products, LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011), that an implied falsehood requires extrinsic evidence of confusion or deception, this Court found that SecurityMetrics' counterclaim failed because SecurityMetrics had not offered admissible extrinsic evidence of confusion or deception.  *See* Dec. 30, 2014 Mem. Op. at 30, ECF No. 342.

In its motion, SecurityMetrics argues that it is entitled to a trial with respect to its fifth counterclaim for false advertising because merchant emails and call recordings constitute extrinsic, non-hearsay evidence that customers were misled.  SM's Mot. Recon. at 9-10.  In particular, SecurityMetrics contends that those pieces of evidence demonstrate that the merchants *thought* PCI Rapid Comply was cheaper than SecurityMetrics' services (or free), and that admission for that limited purpose complies with the Federal Rules of Evidence.  *Id.* at 10.

SecurityMetrics' position, however, ignores the manner in which its false advertising claim was litigated.  First Data's Motion for Partial Summary Judgment attacked the claim as

Considering that First Data had an opportunity to present argument on both statements in both its Response in Opposition *and* at the December 12, 2014 hearing, this Court will not deny First Data's Motion on these grounds.

a misleading advertisement (rather than a literally false one) that lacked the requisite extrinsic evidence. *See* FD's Mem. Supp. Mot. Partial Summ. J. at 13-15. After acknowledging this attack, SecurityMetrics responded accordingly:

> First Data's argument for summary adjudication assumes that literal truth is decided as a matter of law. *Millennium Laboratories, Inc. v. Ameritox, Ltd.*, 924 F. Supp. 2d 594, 602 n. 18 (D. Md. 2013) did indeed state, without citation, that "[l]iteral falsity . . . is a matter of law to be decided by the Court." But according to the Fourth Circuit, "[w]hether an advertisement is literally false is an issue of fact." *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997). "Whether an advertisement is literally false . . . depends on the trier of fact's determination of the message conveyed within its complete context." *JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 128 F. Supp. 2d 926, 934 (E.D. Va. 2001). Here, as a factual matter, a reasonable juror could certainly find that both of the challenged advertisements convey the false message that a merchant who uses SecurityMetrics will have to pay more. Therefore, a jury will have to decide whether First Data's tortured, litigation-induced reading captures what its advertisements "literally" convey.

SM's Opp. at 7, ECF No. 298. As this passage makes clear, SecurityMetrics hung its hat on the contention that the statements were literally false. While SecurityMetrics could have certainly presented an alternative argument that the statements were misleading, it did not do so. Similarly, at the December 12, 2014 motions hearing, counsel for SecurityMetrics pressed the issue of literal falsity rather than the factual underpinnings for a misleading statement.[16]

---

[16] For example, counsel explained to the Court that "our suggestion to the Court today is that, and I'll go through really what I believe the law is and what the law should be applied by the Court might be, is that a literally false statement, A, is a factual determination to be made by a fact-finder." Dec. 12, 2014 Tr. at 49:6-11, ECF No. 329.

As this summary of the history of this case makes clear, SecurityMetrics had an opportunity to litigate the purported misleading nature of First Data's advertisements. The evidence now offered to support such a claim is not newly discovered or previously unavailable. Instead, SecurityMetrics simply attempts to relitigate old matters by raising arguments and presenting evidence that could have been raised prior to this Court's summary judgment ruling. *See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998). Rule 59(e) prohibits this method of conducting litigation, and therefore SecurityMetrics' motion will be denied with respect to the false advertising Lanham Act claim.

### C. Utah Truth in Advertising Claim

At the summary judgment stage, this Court entered judgment in favor of First Data with respect to SecurityMetrics' Utah Truth in Advertising Claim. In reaching that conclusion, this Court noted that it was "undisputed that the relevant provisions of the Utah Truth in Advertising Act, Utah Code § 13-11a-3(1)(b), (c), and (e), SecurityMetrics claims under the state statute fail as well." Dec. 30, 2014 Mem. Op. at 33. This statement was based upon the following assertion by SecurityMetrics in its Opposition brief:

> According to First Data, subdivisions (1)(b), (1)(c), and 1(e) "track the Lanham Act" and so SecurityMetrics' Utah statutory claim, insofar as it arises thereunder, "fails for the same reasons discussed above." (See Mem. at 22.) As shown above, it is First Data's argument, not SecurityMetrics' Lanham Act claims, that fail. Thus First Data's argument regarding the provisions of the Utah statute that "track the Lanham Act" fails, as well.

SM's Opp. MSJ Countercls. at 22, ECF No. 298.  Accordingly, since the Court had already ruled against SecurityMetrics with respect to the Lanham Act counterclaims, this Court also ruled against SecurityMetrics on the Utah Truth in Advertising Claim as well.

In its motion for reconsideration, SecurityMetrics contends that its Truth in Advertising Claim should be reinstated because SecurityMetrics alleged predicates beyond those alleged in the Lanham Act claims.  SecurityMetrics further contends that the requirements of the Truth in Advertising Act differ from the Lanham Act and should not have been summarily adjudicated.

SecurityMetrics' arguments for reinstatement of its Utah Truth in Advertising Act claim are simple attempts to re-litigate the claim.  First Data asserted that the claim rose or fell on the arguments for the Lanham Act claims,[17] and SecurityMetrics never disputed that point.  Indeed, SecurityMetrics opted to rest its defense of the claim on the same grounds as those raised in connection to the Lanham Act claims.  In its opposition to First Data's summary judgment motion, SecurityMetrics made no mention of the other alleged predicates, nor did it reference any evidence to support those allegations in connection to

---

[17] Specifically, First Data's Memorandum Supporting its Motion for Summary Judgment as to Certain of SecurityMetrics' Counterclaims (ECF No. 273) stated that "SM's Eighth Counterclaim alleges that First Data violated Utah's Truth in Advertising Act (the "Utah Advertising Act") by engaging in the same conduct alleged in the 'injurious falsehood' and Lanham Act claims."  FD's Mem. Supp. Mot. Summ. J. Countercls. at 22.  Additionally, First Data argued that "the provisions in the Utah Advertising Act cited by SM track the Lanham Act on consumer confusion, so this claim fails for the same reasons discussed above. See Utah Code § 13-11a-3(1)(b), (c), (e)."  *Id.*

the claim.[18]  As such, Rule 59 may not now be used to raise additional reasons to oppose summary judgment.

### D. Common Law Tort & Damages Claims

SecurityMetrics' ninth counterclaim asserted a cause of action for common law tortious interference.  In support of its damages claims under this tort, SecurityMetrics offered evidence in the form of calls and emails in which purported merchants stated they were canceling or not renewing their contracts with SecurityMetrics.  In its December 30, 2014 Memorandum Opinion, this Court ruled that evidence was inadmissible hearsay under Rule 803(3) of the Federal Rules of Evidence.  This Court noted:

> This Court finds the reasoning of *Air Turbine Tech., Inc. v. Atlas Copco AB*, 295 F. Supp. 2d 1334, 1345-46 (S.D. Fla. 2003), *aff'd*, 410 F.3d 701 (Fed. Cir. 2005), persuasive.  In that case, the district court granted summary judgment after it ruled that customer statements regarding the reasons for their dissatisfaction were inadmissible hearsay when offered to prove causation with respect to lost customers.  Moreover, just as in that case, SecurityMetrics has failed to obtain such evidence directly from customers and has opted to instead rely solely on the recorded phone calls and emails.  As these materials are the only evidence offered to demonstrate causation of damages, SecurityMetrics has failed to offer any admissible evidence in support of its common law counterclaims.  Accordingly, First Data's motion will be granted with respect to counts four and nine of SecurityMetrics' counterclaims.

Dec. 30, 2014 Mem. Op. at 36.

---

[18] As such, SecurityMetrics effectively waived those allegations.  *See Majica v. Montgomery Cnty., MD*, Civ. A. no. 8:12-cv-823-AW, 2013 WL 326734, at *6 (D. Md. Jan. 28, 2013) (finding plaintiff abandoned claim when challenged by motion to dismiss and Plaintiff failed to address claim in response).

In its motion, SecurityMetrics argues that this Court should grant a trial with respect to the tortious interference counterclaim because the statements contained in the various emails and phone recordings are admissible under the state of mind exception of the hearsay rules.  SecurityMetrics' attacks this Court's application of *Air Turbine* to the case at hand and offers citations to a few cases that have purportedly applied Rule 803(3) and the state of mind exception in a manner more compatible with its position before this Court.  *See* SM's Mem. Supp. Mot. Reconsider at 13-18.[19]  These cases, however, do not involve an intervening change of controlling law; indeed, they were decided years before this litigation even commenced by courts other than the United States Supreme Court and the United States Court of Appeals for the Fourth Circuit.  Moreover, the existence of cases offering differing interpretations of the state of mind exception underscores the fact that this Court's evidentiary ruling does not constitute a clear error of law or a manifest injustice. Accordingly, while SecurityMetrics is free to pursue an appeal as to that ruling, SecurityMetrics has failed to present a basis for reconsideration with respect to its tortious interference claim at this juncture.

### E.  Antitrust Counterclaims

Counts ten and eleven of SecurityMetrics' counterclaims asserted antitrust violations under the Sherman Act.   At the summary judgment stage, this Court found that SecurityMetrics had failed to establish an injury that would warrant liability under the

---

[19] Specifically, SecurityMetrics cites to, *inter alia*, *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir. 1962), *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524 (3d Cir. 1990), and *Gallimore v. Newman Machine Co.*, 301 F. Supp. 2d 431 (M.D.N.C. 2004).

antitrust laws.  *See* Dec. 30, 2014 Mem. Op. at 36-39; *see also Thompson Everett, Inc. v. Nat'l Cable Advert.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (stating that the antitrust laws "are intended to protect competition, and not simply competitors" and, therefore, private parties may only recover for "injury caused by damage to the competitive process"); *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 515-16 (4th Cir. 2002) ("[T]o be recovered as antitrust damages, a competitor's loss of profits must stem from a competition-reducing aspect or effect of the defendant's behavior, that is, from acts that reduce output or raise prices to consumers." (internal citations, alterations, and quotation marks omitted)).  In its motion, SecurityMetrics challenges many aspects of this Court's reasoning, but its main argument for reinstating its antitrust claims is that there is no requirement for expert testimony to prove reduced output or frustration of price competition.  In its view, the antitrust claims should have gone to trial regardless of the existence of expert testimony.

In its December 30, 2014 Memorandum Opinion, this Court found that neither the reduced output nor frustration of price competition theories warranted a trial; accordingly, this Court awarded summary judgment to First Data.  In particular, this Court found that the reduced output theory was newly raised at the summary judgment stage; was unsupported by any expert testimony or information obtained through third party discovery; and relied upon speculative conclusions rather than facts in the record.  *See* Mem. Op. at 38.  With respect to the harm to price competition theory, this Court again noted the lack of expert testimony, but the Court also pointed out that SecurityMetrics intended to proceed solely on the prices for its services compared to the price of PCI Rapid Comply without any analysis of price

competition in the market place.   Thus, the Court found that both theories were insufficiently supported to avoid adjudication against SecurityMetrics at the summary judgment state.   In reaching that determination, the Court honored its "affirmative obligation to prevent factually unsupported claims and defenses from going to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

As with SecurityMetrics' arguments with respect to its other counterclaims, SecurityMetrics has failed to present a colorable claim for relief under Rule 59(e). SecurityMetrics has simply attempted to relitigate the issues that were previously argued and decided by this Court.[20]   Indeed, the issue of antitrust injury was raised by First Data's motion for summary judgment, but the matter was also mentioned in connection to several motions *in limine*.   Notably, SecurityMetrics' brief does not identify any comparable antitrust cases to support its arguments that its claims should have survived summary adjudication.[21]

---

[20] The Court notes that SecurityMetrics asserts that it should have been permitted to proceed on its reduced output theory, despite a lack of evidence regarding the status of its other "lost" merchants, because third-party discovery would have been onerous and First Data could have provided the information.   While SecurityMetrics identifies a few cases in which courts have found burden shifting appropriate, those cases arose in totally different circumstances not involving antitrust issues. *See Morris v. Williams*, 433 P.2d 697 (Cal. 1967) (challenge to regulations for state health care program); *United States v. Denver & Rio Grande R. Co.*, 191 U.S. 84 (1903) (action of trover); *Pace v. Hymas*, 726 P.2d 693 (Idaho 1986) (employment & civil rights).   In this case, SecurityMetrics seeks to proceed on a claim where it has speculated about the status of several of its lost merchants and then seeks to utilize that speculation to prove a reduction in the number of data security compliance customers that was caused by First Data's actions, all without any expert analysis or testimony. Such "speculation" and "compilation of inferences" is not sufficient to survive a motion for summary judgment. *See Shin v. Shalala*, 166 F. Supp. 2d at 375.

[21] SecurityMetrics suggests that *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), a case involving reduced output, did not require any expert analysis on the issue of reduced output.   Specifically, the Court noted that, "[i]n this case, we conclude that the finding of actual, sustained adverse effects on competition in those areas where [defendant] dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 461 (1986).   As this passage indicates, the *F.T.C.* arose under very different circumstances—

Nor has SecurityMetrics any new evidence or controlling law.  Accordingly, there is no basis for relief under Rule 59(e).[22]

## II.   <u>Attorneys' Fees</u>

Both parties have filed Motions for Attorneys' Fees.  First Data asserts that it is entitled to the fees arising from the litigation of SecurityMetrics' Lanham Act and Utah Truth in Advertising Act counterclaims, while SecurityMetrics claims that it is entitled to fees incurred during the bench trial.

### A.  First Data's Request for Attorneys' Fees

First Data seeks $764,555.60 in attorneys' fees plus an additional $12,534.51 in expenses in connection with all of its expenses in this litigation, including the litigation of SecurityMetrics' Lanham Act and Utah Truth in Advertising Act counterclaims.[23] Specifically, with respect to the Utah Truth in Advertising Act counterclaim, First Data asserts that Utah law mandates an award of attorneys' fees because it was the prevailing party due to this Court's summary judgment ruling in its favor on those claims.  Furthermore,

---

involving a local market and sustained impact on a market.  Moreover, the issue presented to the Court was whether proof of actual effects on competition was sufficient to render an inquiry into market definition and market power unnecessary; the Court never opined as to the usefulness or necessity of expert testimony as it pertained to proving reduced output.

[22]Although this Court's ruling on summary judgment did not expressly rely on this point, this Court noted that SecurityMetrics' damages expert (Dr. Nelson) had failed to disaggregate his damages calculations.  *See* Dec. 30, 2014 Mem. Op. at 40 n.31.  As this Court pointed out, failure on one of its counterclaims—or simply one of the theories posited in any of those various counterclaims—would give rise to serious issues regarding Dr. Nelson's calculations.  *See* Mem. Op. Mots. *In Limine* at 24 n.27, ECF No. 313 (noting that failure to disaggregate calculation of damages based upon claims becomes problematic after one or more theories of liability are eliminated from a case); *see also Pharmanetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 182 F. App'x 267 (4th Cir. May 31, 2006) (unpublished); *Comcast Corp. v. Behrend*, --- U.S. ----, 133 S. Ct. 1426 (2013). This matter has yet to be addressed in SecurityMetrics' filings.

[23] In its Reply brief, First Data also seeks an additional $134,865.04 in attorneys' fees that were incurred in preparing its fee petition and supporting papers.

First Data contends that the fees relating to the Lanham Act claims are recoverable because those claims were intertwined with the Utah statutory claim.   Alternatively, First Data contends that it is entitled to attorneys' fees under the Lanham Act because of the "exceptional" nature of this case.   For the reasons explained below, however, this Court finds that an award of attorneys' fees to First Data under any of these theories would be inappropriate in light of the circumstances of this case and the limited issues on which First Data prevailed.

### 1.   *The Utah Truth in Advertising Act*

Under § 13-11a-4 of the Utah Code, "the court shall award attorneys' fees to the prevailing party." § 13-11a-4(c).  First Data asserts that this provision entitles it to attorneys' fees because SecurityMetrics' counterclaim under the Utah Truth in Advertising Act was adjudicated in First Data's favor at the summary judgment stage.

Under Utah law, this court must apply a "flexible and reasoned" approach to determine which party prevailed in the action.  *A.K.&R. Whipple Plumbing & Heating v. Guy*, 2004 UT 47, ¶ 8 (2004).  The determination is context-specific and is left "to the sound discretion of the trial court."  *Radman v. Flanders Corp.*, 2007 UT App. 351, ¶ 26 (2007). Under this test, the trial court should consider a variety of factors, including "[1] the number of claims, counterclaims, cross-claims, etc., brought by the parties, [2] the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole, and [3] the dollar amounts attached to and awarded in connection with the various claims."  *See id.*; *see also Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App 37, ¶ 10 (2014) ("This

approach should take into consideration the significance of the net judgment in the case and the amounts actually sought[,] . . . balanc[ed] . . . proportionally with what was recovered." (internal quotation marks omitted)). In complex cases, it is possible that both—or neither— of the parties will be the prevailing party. *See Radman*, 2007 UT App. at ¶ 27 n.11; *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶25 (2002); *Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App. at ¶ 10 ("[I]t is possible that neither party is entitled to attorney fees as the prevailing party; our supreme court has explicitly recognized that it has never . . . applied any standard that precludes a finding of a draw." (internal quotation marks omitted)).

Under the circumstances of this case, this Court finds that First Data is not a "prevailing party" warranting an award of attorneys' fees under Utah law. While this Court ultimately found that SecurityMetrics had failed to present sufficient evidence to warrant sending the Lanham Act and Utah Truth in Advertising Act claims to a jury, First Data had only limited success when the case is considered as a whole. First Data initiated the initial Utah litigation, which was quickly resolved by a settlement that involved a substantial payment by First Data to SecurityMetrics coupled with a provision that allowed SecurityMetrics to use valuable customer data supplied by First Data for purposes of soliciting customers.

Upon initiation of further litigation (by First Data in this Court and by SecurityMetrics in the District of Utah) and consolidation in this Court, First Data ultimately asserted nine affirmative claims for relief and SecurityMetrics asserted fifteen counterclaims. Thus, when compared to the twenty-four total claims for affirmative relief, SecurityMetrics'

four Lanham Act and Utah Truth in Advertising Act counterclaims occupied a peripheral position in the litigation as a whole.  Of course, First Data did manage to obtain a summary judgment on these counterclaims (as well as some other counterclaims) upon its various motions.   Additionally, the parties settled several of First Data's affirmative claims in the weeks before trial.   However, the *only* issue that went to trial—the competing declaratory judgment claims that required this Court to determine the meaning of the "merchant data" provision of the Terms of Settlement—was decided in SecurityMetrics' favor.  First Data was not a prevailing party at trial. Indeed, it did not produce any of its representatives as witnesses.

In assessing whether First Data is a prevailing party under Utah law, this Court may also consider the importance of the Utah Truth in Advertising Act and Lanham Act claims within the context of the case as a whole.  Indeed, despite the massive number of claims and counterclaims lobbed against each other by the parties, this case ultimately boiled down to a dispute over the terms of disengagement for two former business partners.[24]  And within that context, it is clear that the issue of SecurityMetrics' use of merchant data was of great importance throughout this litigation (and the parties' prior relationship as well).   It warranted an express provision in the parties' Terms of Settlement in the initial litigation,

---

[24] Both parties initially sought damages in connection to some of their claims, *see* Pls.' Am. Compl. 49, ECF No. 92; Def.'s Countercl. 69, ECF No. 157, but no damages were ultimately awarded to either party.  In the context of this case, however, the Court does not view the specific dollar amounts sought to be a particularly helpful metric by which to assess the parties' success.  The various claims for injunctive and declarative relief predominated and were the most heavily and contentiously litigated; indeed, the record reflects countless disputes arising from this Court's interim orders governing the conduct of the parties and their interactions with third parties during the pendency of this litigation.

and the matter was again raised in this action in the form of competing claims for declaratory judgment. Of the myriad issues raised by the parties' claims and counterclaims, it was the sole matter that the parties insisted on taking to trial. And, with respect to this weighty issue, First Data suffered a resounding loss.

The nature of First Data's "success" with respect to these four counterclaims was also rather limited. While the Court ruled that SecurityMetrics had failed to present sufficient evidence to survive a motion for summary judgment, the Court never ruled that the conduct of which SecurityMetrics complained was not actionable. Indeed, First Data has never asserted that it is free to resume this conduct, and it has in fact retired its PCI Rapid Comply service.

Thus, after considering First Data's limited success on the Utah Truth in Advertising counterclaims (and Lanham Act counterclaims) in the context of this case as a whole, this Court cannot find that First Data was a prevailing party deserving of an award of attorneys fees under § 13-11a-4 of the Utah Code.[25] At best, the litigation resulted in a draw for which no fees would be appropriate. *See Radman*, 2007 UT App. at ¶ 27 n.11; *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶25 (2002); *Giles v. Mineral Res. Int'l, Inc.*, 2014 UT App. at ¶ 10.

### 2. The Lanham Act

Under 15 U.S.C. § 1117, a district court "in exceptional circumstances may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). The United States

---

[25] While First Data employed retired Judge Benson Legg, previously a member of this Court, to opine on the reasonableness of First Data's fees, Judge Legg did not consider whether First Data was a prevailing party under Utah law.

Court of Appeals for the Fourth Circuit has recently provided guidance regarding the contours of this standard:

> [A] district court may find a case "exceptional" and therefore award attorneys fees to the prevailing party under § 1117(a) when it determines, in light of the totality of the circumstances, that (1) "there is an unusual discrepancy in the merits of the positions taken by the parties," *Fair Wind Sailing*, 764 F.3d at 315, based on the non-prevailing party's position as either frivolous or objectively unreasonable, *see Octane Fitness*, 134 S. Ct. at 1756 n. 6; (2) the non-prevailing party "has litigated the case in an 'unreasonable manner,'" *Fair Wind Sailing*, 764 F.3d at 315 (quoting *Octane Fitness*, 134 S. Ct. at 1756); or (3) there is otherwise "the need in particular circumstances to advance considerations of compensation and deterrence," *Octane Fitness*, 134 S. Ct. at 1756 n. 6 (quoting *Fogerty*, 510 U.S. at 534 n. 19, 114 S. Ct. 1023) (internal quotation marks omitted).

*Georgia-Pac. Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 721 (4th Cir. 2015), as amended (Apr. 15, 2015). First Data asserts that SecurityMetrics' Lanham Act claims fall under the first category as frivolous or objectively unreasonable claims. *See* FD's Mem. Supp. Mot. Attorneys' Fees at 11, ECF No. 397.

This Court finds, however, First Data has failed to demonstrate that this litigation presents an "exceptional" case warranting an award of attorneys' fees. First Data attacks SecurityMetrics' marshalling of evidence to support the Lanham Act claims, but it ignores the manner in which the parties actually litigated the counterclaims. SecurityMetrics argument at the summary judgment stage was that First Data's statements were literally false. While this Court ultimately ruled against SecurityMetrics on this legal issue, SecurityMetrics' position was not an objectively unreasonable one. This Court's ruling at the motion to

28

dismiss stage did not explicitly eliminate the possibility of a finding of literal falsity, and SecurityMetrics was entitled to proceed as it did.[26]

First Data also suggests that this Court should make a finding of exceptionality based upon SecurityMetrics' decision to hire Dr. Michael Belch, whose survey evidence was excluded by this Court's December 3, 2014 Memorandum Opinion and separate Order. *See* ECF Nos. 313 & 314.  Despite First Data's emphatic characterization of Dr. Belch as wholly unqualified, First Data's motion *in limine* with respect to Dr. Belch was far from a certain victory, and the matter was heavily and closely litigated.  Moreover, as this Court's opinion made clear, one of the primary concerns with Dr. Belch's testimony was the potential for jury confusion.  At the time, the parties had not stipulated to a bench trial.  Accordingly, SecurityMetrics' litigation tactics with respect to Dr. Belch were not objectively unreasonable.  As such, First Data has failed to establish that SecurityMetrics' Lanham Act claims constitute an "exceptional" case, and therefore, this Court does not find that an award of attorneys' fees is appropriate.[27]

## B.  SecurityMetrics' Request for Attorneys' Fees

[26] The Court notes that First Data's challenge to the Lanham Act counterclaims in its Motion to Dismiss Counterclaims was not framed in the context of a literally false vs. misleading dichotomy; instead, First Data challenged the counterclaim because it asserted that the counterclaim was premised upon a failure to disclose, which it asserted was not actionable in the Fourth Circuit.  *See* FD's Mem. Supp. Mot. Dismiss Certain Countercls. at 8, ECF No. 163-1.  As this was the issue raised by the parties, the Court's ruling was limited to that precise issue.

[27] Because this Court finds that First Data is not entitled to attorneys' fees under either the Utah Truth in Advertising Act or the Lanham Act, this Court does not address the reasonableness of First Data's claimed fees.  This Court notes, however, that First Data's fee allocations appear somewhat concerning.  First Data's use of a 4/15 reduction is problematic as First Data also had nine affirmative claims for relief.  Several of the entries on just the first few pages of First Data's schedule of charges do not indicate whether the work was performed in an offensive posturing with respect to First Data's affirmative claims or in a defensive posture with respect to SecurityMetrics' counterclaims.

29

SecurityMetrics has asserted a limited request for attorneys' fees arising from the bench trial in the amount of $44,213.75.[28]   However, SecurityMetrics' motion expressly states that "if the Court declines to grant First Data any of the fees requested [by its Motion for Attorneys' Fees], . . . then SecurityMetrics will withdraw the request by its Motion, as well." SM's Mem. Supp. Mot. Attorneys' Fees at 1, ECF No. 396.  As this Court has refused to award any attorneys' fees to First Data, this Court finds that SecurityMetrics' Motion for Attorneys' Fees will be deemed to have been withdrawn.

CONCLUSION

For the reasons stated above, SecurityMetrics' Motion for Leave to File Audio Recording as Exhibit (ECF No. 393) is GRANTED, but its Motion for Relief Under Federal Rule of Civil Procedure 59 (ECF No. 390) is DENIED.  First Data's Motion for Attorneys' Fees (ECF No. 386) is DENIED, and SecurityMetrics' Motion to Strike New Evidence on Reply (ECF No. 407) is DENIED AS MOOT.   Finally, SecurityMetrics' Motion for Attorneys' Fees (ECF No. 388) is construed as WITHDRAWN.

A separate Order follows.

Dated:         September 22, 2015                         _____/s/_____
                                                         Richard D. Bennett
                                                         United States District Judge

---

[28] SecurityMetrics originally sought $52,876.25 in attorneys' fees, but it reduced the amount via its Notice of Errata re Motion for Attorneys Fees (ECF No. 399).